IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM QUADE, | ) | |
| | ) | Case No. 06 C 1505 |
| Plaintiff, | ) | |
| | ) | Judge Virginia M. Kendall |
| v. | ) | |
| | ) | |
| SEAMUS A. KAPLAN, | ) | |
| VILLAGE OF MUNDELEIN and | ) | |
| MUNDELEIN POLICE DEPARTMENT, | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff William Quade ("Quade" or "Plaintiff") filed suit against defendants Seamus A. Kaplan, the Village of Mundelein, and the Mundelein Police Department alleging excessive force in violation of the Fourth Amendment, 42 U.S.C. § 1983 and battery. The Court previously dismissed the Mundelein Police Department from the action pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Seamus Kaplan and the Village of Mundelein (collectively "Defendants") now move for summary judgment on all claims. For the reasons set forth below, Defendant Kaplan's Motion for Summary Judgment is denied. The Village of Mundelein's Motion for Summary Judgment is granted in part and denied in part.

## STATEMENT OF UNDISPUTED FACTS

This Complaint arises out of an incident that occurred in the early hours of March 21, 2005, when Mundelein Police Officer Seamus A. Kaplan ("Kaplan") shot at William Quade's ("Quade" or "Plaintiff") vehicle several times, lodging two bullets in Quade's back.[1] (Pl. Resp. 56.1 Kaplan

---

[1] Citations to "Plaintiff's Response to Defendant's, Seamus Kaplan, Local Rule 56.1 Statement of Facts" have

1

¶¶ 12-13, 70.)  Officer Kaplan alleges that he fired the shots in self-defense of Quade's actions on the scene - specifically, that Quade attempted to run him over with his car.  Quade alleges he was not under arrest and the force used to stop him from leaving the scene was excessive.

Kaplan has been employed by the Village as a police office for the past five and one-half years.  (Pl. 56.1 Resp. Village ¶ 3.)  Prior to joining the Mundelein Police Department ("the Department"), Kaplan worked as a police officer for the Village of Lake Bluff until he was terminated for his failure to follow direct orders.[2]  (Pl. 56.1 Resp. Village ¶ 4; Def. Vill. 56.1 Resp. ¶ 1.) While employed by the Village of Lake Bluff, Kaplan attended the Police Academy, the Police Training Institute ("PTI") at the University of Illinois, and the Field Training Officer ("FTO") program.  (Pl. 56.1 Resp. Village ¶ 5.)  Because he had already completely his academic training when he joined the Department, the Department placed Kaplan in an FTO program for three months. (Pl. 56.1 Resp. Village ¶ 6.)

Throughout his employment with the Department, Kaplan received several written warnings and reprimands.  (Def. Village 56.1 Resp. ¶ 3; Pl. 56.1 Resp. Village, Ex. B, Mundelein Police Department Personnel Records.)  Department officials also explicitly questioned Kaplan's decision-making ability in Kaplan's personnel records and, on one occasion, suspended Kaplan after Kaplan failed to report for his assigned detail at a high school homecoming parade.  (Pl. 56.1 Resp. Village ¶¶ 4, 6; Pl. 56.1 Resp. Village, Ex. B,  Mundelein Police Department Personnel Records.)  In

---

been abbreviated to "Pl. 56.1 Resp. Kaplan."  Citations to "Plaintiff's Response to Defendant's, Village of Mundelein, Local Rule 56.1 Statement of Facts" have been abbreviated to "Pl. 56.1 Resp. Village."  Citations to Kaplan's "Response to Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts" have been abbreviated to "Def. Kaplan 56.1 Resp."  Finally, citations to the "Village of Mundelein's Answers to Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts" have been abbreviated to "Def. Village 56.1 Resp."

[2] Quade also submits that the Mundelein Police Department knew that Kaplan had previously been terminated by the Village of Lake Bluff Police Department.  (Def. Village 56.1 Resp. ¶ 2.)  Because this statement is not supported by Quade's citation to the record, the Court will not consider the statement.  *See* L.R. 56.1.

addition, police department officials have utilized several performance improvement plans and counseling sessions in an attempt to improve Kaplan's shortcomings as a police officer. (Def. Village 56.1 Resp. ¶ 5.)

On March 20, 2005, Quade, then eighteen years-old, gathered at his home in Chicago, Illinois

with David Moore ("Moore") and Robert Diaz ("Diaz"). (Pl. 56.1 Resp. Kaplan ¶¶ 2, 6.) Between the hours of 5:00 p.m. (at the earliest) and 11:00 p.m. to 11:30 p.m. (at the latest), Quade snorted one line of cocaine and consumed approximately one-half of a fifth of brandy and between seven to eight and one-half beers. (Pl. 56.1 Resp. Kaplan ¶¶ 5, 8, 11.) At the end of the night, Quade (accompanied by Moore) drove Diaz to his home in Vernon Hills. (Pl. 56.1 Resp. Kaplan ¶¶ 12-13.)

On the return trip, Quade became lost. (Pl. 56.1 Resp. Kaplan ¶ 14.) While stopped at a red light, Quade decided to ask Officer Hall, a Mundelein police officer who was also stopped at the light, for directions. (Pl. 56.1 Resp. Kaplan ¶ 14-16.) During the conversation, Officer Hall developed a suspicion that Quade was under the influence of an unknown substance. (Pl. 56.1 Resp. Kaplan ¶¶ 15, 17-18.) Officer Hall and Quade continued to discuss directions when the traffic signal turned from red to green. (Pl. 56.1 Resp. Kaplan ¶ 19.) To avoid holding up traffic, Officer Hall told Quade to pull into a nearby parking lot. (*Id.*) Officer Hall activated his emergency lights and followed Quade to the lot. (Pl. 56.1 Resp. Kaplan ¶ 20.) Quade drove to the parking lot as instructed and stopped his car approximately ten feet from the lot's entrance. (Pl. 56.1 Resp. Kaplan ¶¶ 21, 23.) The lot entrance was the only means of ingress or egress to the parking lot. (Pl. 56.1

Resp. Kaplan ¶ 22.)  The parking lot spanned an area of approximately sixty feet by sixty feet.[3]  (Pl.

56.1 Resp. Kaplan ¶ 22; Def. Kaplan 56.1, Ex. C, Hall Dep. at 77-78.)  A building ran along the

north side of the lot and a line of trees bordered the east side.  (Pl. 56.1 Resp. Kaplan ¶ 22.)  The

entrance/exit of the lot was located on the west side.  (*Id.*)

Officer Hall pulled up alongside of Quade.  (Pl. 56.1 Resp. Kaplan ¶¶ 21, 23.)  At some

point, Officer Hall contacted dispatch and requested the assistance of a second police officer.  (Pl.

56.1 Resp. Kaplan ¶ 26.)  When the call for backup came through the radio, Kaplan heard Officer

Hall request a second unit and heard him indicate that there was "no hurry." (Pl. 56.1 Resp. Kaplan

¶ 27.)  According to Kaplan, "no hurry" typically means that the officer has a stop that is suspicious,

has a possible DUI, or  wants to search the stopped vehicle. (*Id.*; Def. Kaplan 56.1, Ex. D, Kaplan

Test. 109-10.)  Kaplan did not know why Officer Hall stopped Quade when he responded to the call.

(Def. Kaplan 56.1 Resp. ¶ 3.)

After contacting dispatch, Officer Hall approached the driver's side of Quade's vehicle.  (Pl.

56.1 Resp. Kaplan ¶ 29.)  The parties dispute whether, upon reaching the vehicle, Officer Hall asked

Quade for his license and to exit his vehicle.  (Pl. 56.1 Resp. Kaplan ¶¶ 29-30, 33; Def. Kaplan 56.1,

Ex. C, Hall Dep. at 84-86;  Pl. 56.1 Resp. Kaplan, Ex. C, Quade Dep. at 39.)  Shortly after, Quade

put the car's gear shift in drive, accelerated very quickly towards the rear of the parking lot, and

drove forward approximately fifty feet (to the eastern edge of the parking lot).  (Pl. 56.1 Resp.

Kaplan ¶¶ 35, 37.)  At the same time, Mundelein police officer Eric Guenther ("Commander

---

[3] In Plaintiff's Response to Defendant's, Seamus Kaplan, Local Rule 56.1 Statement of Facts, Kaplan states and Quade admits that the parking lot was sixty square feet. (Pl. 56.1 Resp. Kaplan ¶ 22.)  In support of this statement, Kaplan cites to Officer Hall's transcript, in which he states that the parking lot spanned approximately sixty feet in each direction.  (Def. Kaplan 56.1, Ex. C, Hall Dep. at 77-78.)  The Court interprets Kaplan's statement of fact and Quade's admission to the fact as an inadvertent misinterpretation of Hall's testimony and adopts the description of the lot as reflected in the cited portion of Hall's deposition.

Guenther") arrived on the scene. (*Id.*) Upon pulling into the parking lot, Commander Guenther observed Quade's vehicle in motion. (Pl. 56.1 Resp. Kaplan ¶ 39.) In response, Commander Guenther drove to the northeast portion of the parking lot and stopped his vehicle, an SUV, approximately one foot from Quade's vehicle in an attempt to block Quade. (Pl. 56.1 Resp. Kaplan ¶¶ 39-40.) During this time, Quade stopped his forward movement and began to back up towards the southeast corner of the parking lot. (Pl. 56.1 Resp. Kaplan ¶ 40.) Officer Hall ran towards Quade's vehicle and ordered Quade to stop. (Pl. 56.1 Resp. Kaplan ¶ 42.) Shortly after, Kaplan entered the parking lot. (*Id.*)

Prior to entering the lot, Kaplan saw Commander Guenther activate his lights and enter the lot. (Pl. 56.1 Resp. Kaplan ¶ 44.) Upon entering the lot, Kaplan observed: (1) Quade's vehicle in motion; (2) Officer Hall standing next to Quade's vehicle; and (3) Commander Guenther blocking Quade's attempt to exit the parking lot with his car. (Pl. 56.1 Resp. Kaplan ¶ 45.) Kaplan stopped his vehicle in the southeast portion of the lot and exited his vehicle, (Pl. 56.1 Resp. Kaplan ¶¶ 46, 48), pulled out his gun, and ran to the rear of Commander Guenther's SUV. (Pl. 56.1 Resp. Kaplan ¶¶ 47, 51.) At that time, he did not know why Officer Hall initially stopped Quade. (Pl. 56.1 Resp. Kaplan ¶ 46; Def. Kaplan 56.1 Resp. ¶ 3.) Simultaneously, Officer Hall walked past Kaplan and towards Quade's vehicle, which was still positioned in the southeast corner of the parking lot. (Pl. 56.1 Resp. Kaplan ¶ 48.) With his gun drawn, Officer Hall yelled at Quade to turn off and exit his vehicle (Pl. 56.1 Resp. Kaplan ¶¶ 48-49.)

As Officer Hall approached Quade, Kaplan continued his movement towards the rear of Commander Guenther's SUV. (Pl. 56.1 Resp. Kaplan ¶¶ 53; Kaplan 56.1 Resp. ¶ 4.) Commander Guenther had parked the SUV approximately twelve to fifteen feet from the building that ran along

the north end of the parking lot. (Pl. 56.1 Resp. Kaplan ¶ 54.) Despite Commander Guenther's orders to stop, Quade began to slowly drive his car around the front of Commander Guenther's SUV. (Pl. 56.1 Resp. Kaplan ¶¶ 53, 55; Def. Kaplan. 56.1 Resp. ¶ 4.) While doing so, Quade kept himself as close as possible to the building located on the north side of the lot. (Kaplan 56.1 Resp. ¶ 6.) Fearing that Quade's vehicle would not fit in the space between Commander Guenther's vehicle and the building, Commander Guenther, who was not fully out of his SUV, went back inside his SUV and shut the door. (Pl. 56.1 Resp. Kaplan ¶ 56.) Because he could not see Quade, Officer Hall then ran towards his squad car, which was still parked near the parking lot's exit. (Pl. 56.1 Resp. Kaplan ¶¶ 57-58.)

As Kaplan came around the rear of Commander Guenther's vehicle he observed Quade turning his vehicle around the front of Guenther's vehicle and towards the exit. (Pl. 56.1 Resp. Kaplan ¶ 61.) During this time, Kaplan also observed Officer Hall running towards the area of Officer Hall's squad car. (Pl. 56.1 Resp. Kaplan ¶ 60.) Quade admits that he saw Kaplan at the rear of the SUV, but the parties dispute how far Kaplan positioned himself from the rear of Officer Guenther's SUV. (Pl. 56.1 Resp. Kaplan ¶¶ 59, 61; Kaplan 56.1 Resp. ¶ 4; Def. Kaplan 56.1, Ex. G, Kaplan Dep. at 65; Pl. 56.1 Resp. Kaplan, Ex. C, Quade Dep. at 53-54; Pl. 56.1 Resp. Kaplan, Ex. H, Guenther Dep. at 68.) Kaplan contends that he came around the SUV and placed himself near the rear fender of the SUV. (Pl. 56.1 Resp. Kaplan ¶¶ 59, 61; Def. Kaplan 56.1, Ex. G, Kaplan Dep. at 65, 71.) Quade testified that Kaplan positioned himself approximately ten feet from the rear of the SUV. (Pl. 56.1 Resp. Kaplan, Ex. C, Quade Dep. at 53-54.) Upon seeing Quade's vehicle, Kaplan stopped his forward movement, yelled, "stop or I will shoot," and began to back away. (Pl. 56.1 Resp. Kaplan ¶¶ 62-63.)

The parties dispute what occurred after Kaplan ordered Quade to stop. Kaplan testified that, in response to his order, Quade lay down over the center console of his vehicle, turned his wheel left, accelerated forward toward Kaplan, and struck Kaplan with his car in the left knee and left side of his leg. (Pl. 56.1 Resp. Kaplan ¶¶ 64-65; Def. Kaplan 56.1, Ex. G, Kaplan Dep. at 75-77.) In one fluid motion, Kaplan then braced himself with his left hand on the left side hood and fender of Quade's vehicle, ordered Quade to stop, pushed off the vehicle, and fired his weapon six times. (Pl. 56.1 Resp. Kaplan ¶ 65; Def. Kaplan 56.1, Ex. G, Kaplan Dep. at 77-80, 88, 112.)

Quade denies that he drove towards Kaplan, that he lay over the center console before Kaplan began to fire, or that he ever struck Kaplan. (Pl. 56.1 Resp. Kaplan ¶¶ 64-65; Pl. 56.1 Resp. Kaplan, Ex. C, Quade Dep. at 53-55, 103; Def. Kaplan 56.1 Resp. ¶ 6.) According to Quade, Quade moved forward after clearing the SUV and stayed as close as possible to the building on the north side of the lot. (Pl. 56.1 Resp. Kaplan ¶ 65; Pl. 56.1 Resp. Kaplan, Ex. C, Quade Dep. at 53-55; Def. Kaplan 56.1 Resp. ¶¶ 5-6.) At some point, Quade accelerated forward, drove past Kaplan, and was pulled down over the center console by Moore because (and only after) Kaplan began shooting at the car.[4] (Pl. 56.1 Resp. Kaplan ¶ 64; Def. Kaplan 56.1 Resp. ¶ 6; Pl. 56.1 Resp. Kaplan, Ex. C, Quade Dep. at 52-54.)

It is undisputed that Kaplan was not in front of Quade's vehicle when he fired at Quade. (Def. 56.1 Resp. Kaplan ¶ 7.) Kaplan began to shoot only after the front of Quade's vehicle passed him. (Def. 56.1 Resp. Kaplan ¶ 8.) At that time, Kaplan remained to the left of Quade's vehicle and behind the vehicle's front bumper. (Def. 56.1 Resp. Kaplan ¶ 7.) Kaplan braced himself against the

---

[4] In "Plaintiff's, William Quade, Local Rule 56.1 Statement of Facts" Quade further submits that "[t]he front of Quade's car never faced Kaplan," (Def. Kaplan 56.1 Resp. ¶ 6), and that Kaplan was located at least ten feet to the left of Quade's car, (Def. Kaplan 56.1 Resp. ¶ 5). Because neither statement is supported by Quade's citations to the record, the Court will not consider these statements. *See* L.R. 56.1.

hood and fender of Quade's vehicle, pushed off the car, and fired his weapon at Quade's vehicle. (Pl. 56.1 Resp. Kaplan ¶ 66; Def. Kaplan 56.1 Resp. ¶¶ 7-8.)  Kaplan's initial shots went through the driver's side window.  (Def. Kaplan 56.1 Resp. ¶ 8; Pl. 56.1 Resp. Kaplan ¶ 66.)  The vehicle continued past Kaplan as he continued to shoot.  (Pl. 56.1 Resp. Kaplan ¶ 66.)  Kaplan fired at least one shot after Quade passed Kaplan and at least one shot that shattered the back window of Quade's vehicle.  (Def. 56.1 Resp. Kaplan ¶¶ 13-14.)  Two of the shots fired by Kaplan struck Quade in the back.  (Pl. 56.1 Resp. Kaplan ¶ 70; Def. Kaplan 56.1 Resp., Ex. A, Quade Dep. at 65; Pl. Resp. 56.1 Kaplan, Ex. G, Hunt Dep. at 50.)

The parties dispute how many shots were fired during the incident in question; Kaplan testified that he fired six shots at Quade, while Quade submits that additional shots were fired.  (Pl. 56.1 Resp. Kaplan ¶ 67; Pl. 56.1 Resp. Kaplan, Ex. I, Owen Dep. at 34, 36.)  The parties also dispute how long it took Kaplan to fire the shots; Kaplan contends it lasted less than one second while Quade maintains that it may have taken up to three seconds.  (Pl. 56.1 Resp. Kaplan ¶ 67; Pl. 56.1 Resp. Kaplan, Ex. F, Waller Dep. at 207; Kaplan 56.1 Resp., Ex. G, Kaplan Dep. at 112.)    It is undisputed that Kaplan remained stationary as he fired each shot.  (Def. Kaplan 56.1 Resp. ¶ 10; Pl. 56.1 Resp. Kaplan ¶ 75; Pl. 56.1 Resp. Kaplan, Ex. D, Kaplan Dep. at 92.)

After shooting at Quade, Officers Hall and Kaplan chased Quade's vehicle towards the exit of the parking lot.  (Pl. 56.1 Resp. Kaplan ¶ 71.)  Quade, still in his vehicle, proceeded over a curb out of the parking lot and accelerated down the road.  (Pl. 56.1 Resp. Kaplan ¶¶ 71, 78.)  Quade eventually came to a stop in a ditch and was arrested.  (Pl. 56.1 Resp. Kaplan ¶¶ 80, 84.)

Kaplan testified that, as he shot at Quade, he feared for himself, Officer Hall, and the public. With respect to himself, Kaplan testified that he feared for his life when he fired his weapon because

he believed that Quade would run him over and kill him. (Pl. 56.1 Resp. Kaplan ¶¶ 74-75; Def. Kaplan 56.1, Ex. G, Kaplan Dep. at 111.) In addition, he feared that he would be run over if he fell and, when he pushed off the car, did not know whether he would land on his feet. (Pl. 56.1 Resp. Kaplan ¶ 75; Def. Kaplan 56.1, Ex. G, Kaplan Dep. at 111.)

Kaplan also fired at Quade because he believed the Quade would possibly drive behind Kaplan and run over Officer Hall. (Pl. 56.1 Resp. Kaplan ¶ 74.) Kaplan testified that he saw Officer Hall running towards his squad car when Kaplan initially ran around the back of Commander Guenther's SUV, but did not see Officer Hall when Kaplan began firing at Quade. (Pl. 56.1 Resp. Kaplan ¶¶ 60, 70, 77.) The parties dispute, however, the extent of Kaplan's belief that Officer Hall was located behind him. (Pl. 56.1 Resp. Kaplan ¶¶ 74, 77; Pl. 56.1 Resp. Kaplan, Ex. B, Criminal Trial Transcript at 169; Def Kaplan 56.1, Ex. G, Kaplan Dep. at 88-89.) Finally, when asked if he fired at the vehicle because he feared for the safety of the public, Kaplan responded as follows: "Yes, I was also firing for the safety of Officer Hall." (Pl. 56.1 Resp. Kaplan ¶ 76; Def. Kaplan 56.1, Ex. G, Kaplan Dep. at 114.)

<u>Village Policies and Procedures</u>

Every Mundelein police officer must attend a yearly "use-of-force" training session, which includes recertification. (Pl. 56.1 Resp. Village ¶¶ 11, 15; Def. Village 56.1 Resp., Ex. C, Parrish Dep. at 27.) In addition, the Department also provides "controlled force" and "controlled tactics" training as well as "less lethal use-of-force" training. (Pl. 56.1 Resp. Village ¶ 8; Def. Village 56.1 Resp., Ex. A, Kaplan Dep. at 123, 125.) Finally, the Department also provides "a daily training calendar at roll call." (Pl. 56.1 Resp. Village ¶ 12.) "Use of force" is one of the items reviewed during the roll call training. (Def. Village 56.1 Resp., Ex. B, Eugenis Dep. at 8.) During a roll call

training concerning the use of force, a police officer will convene with the rest of his shift and the supervisor will review the "Use of Force General Order" with the officers. (Pl. 56.1 Resp. Village ¶ 12; Def. Village 56.1 Resp., Ex. B, Eugenis Dep. at 8-9.) According to Sergeant Mark Parrish ("Sergeant Parrish"), who conducts in-service training for less-lethal force and instructs the yearly use of force class, "use of force" training could also include watching videos and reviewing policies or portions of certain policies to be sure that the officer understands them. (Pl. 56.1 Resp. Village ¶¶ 13, 14; Def. Village 56.1, Ex. C, Parrish Dep. at 6, 18-19.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion

of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

**DISCUSSION**

As an initial matter, Kaplan has filed a motion to strike Quade's Sur-Reply as well as a motion to strike certain portions of Quade's Local Rule 56.1 submissions. With respect Kaplan's motion to strike Quade's sur-reply, Kaplan contends that Quade's Sur-Reply exceeds the scope of this Court's order granting Quade leave to file a Sur-Reply. The Court initially granted Quade until October 10, 2007 to file a written sur-reply addressing certain collateral estoppel issues raised by Kaplan. (*See* Mot. Strike Pl. Resp. Def. Kaplan Reply, Ex. 1, Sept. 19, 2007 at Tr. 4-5.) At that time, the Court also ordered Quade to file by the same date any response to Kaplan's separately filed motion to strike certain portions of Quade's Local Rule 56.1 submissions.. (*See* Dk. # 110.) Subsequently, Kaplan withdrew his arguments relating to collateral estoppel. (*See* Dk. # 113.) On October 10, 2007, Quade filed a written sur-reply. (*See* Dk. # 110-15.)

Quade's sur-reply addresses both the merits of Kaplan's Reply In Support of Motion for Summary Judgment as well as certain evidentiary issues raised by Kaplan's motion to strike portions of Quade's Local Rule 56.1 submissions. It does not, however, address Kaplan's collateral estoppel arguments as the need to address this issue became moot when Kaplan withdrew his collateral estoppel arguments. Because the Court granted Quade leave to file a written sur-reply for the limited purpose of addressing a collateral estoppel previously raised by Kaplan, the Court grants Kaplan's Motion to Strike Plaintiff's Response to Defendant Seamus Kaplan's Reply in Support of his Motion for Summary Judgment to the extent that sur-reply addresses substantive issues raised by Kaplan's Reply in Support of Motion For Summary Judgment. However, the Court denies this

motion to strike to the extent that the sur-reply addresses evidentiary issues raised by Kaplan's separately filed motion to strike portions of Quade's Local Rule 56.1 submissions. As noted above, the Court granted Quade leave to file a response to this motion by October 10, 2007. Because Quade's sur-reply also addresses this latter motion to strike and was timely filed, the Court will consider the sur-reply to the extent that its serves as Quade's response to Kaplan's motion to strike portions of Quade's Local Rule 56.1 submissions.

For the reasons stated above, the Court grants in part and denies in part Defendant Seamus Kaplan's Motion to Strike Plaintiff's Response to Defendant Seamus Kaplan's Reply In Support of His Motion for Summary Judgment. In addition, Defendant Kaplan's Motion to Strike Portions of Plaintiff's Local Rule 56.1(b)(3)(B) Response to Kaplan's Statement of Facts and Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts is granted in part and denied in part consistent with this Opinion.

I.    Fourth Amendment Excessive Force (Count I)

Quade's § 1983 excessive force claim is based on the alleged violation of Quade's Fourth Amendment right to be free from unreasonable seizures. Under *Tennessee v. Garner*, a police officer may use deadly force to prevent escape "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," 471 U.S. 1, 11 (1985); "it is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him dead,'" *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (per curiam) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

To determine whether the force used to effect a seizure is unreasonable, a court must examine the "totality of circumstances" surrounding the incident. *Garner*, 471 U.S. at 8-9. The

Fourth Amendment's reasonableness test is an objective one. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Thus, reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Moreover, the reasonableness calculation "must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Courts should consider factors such as, "[t]he severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. "'[W]hen an officer believes that a suspect's actions [place] him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force.'" *Scott v. Edinburg*, 346 F.3d 752, 756 (7th Cir. 2003) (*quoting Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002)).

Kaplan presents two rationales to justify his use of deadly force. First, Kaplan contends that Quade committed a forcible felony by trying to run over him with his vehicle, a deadly weapon, which made it reasonable for him to protect himself by firing at Quade. (Def. Kaplan. Mem. 3.) Second, Kaplan asserts that it was objectively reasonable to use deadly force to protect Officer Hall. (*Id.*) The main issue with respect to both these justifications is whether Quade posed an immediate threat to Kaplan or the safety of the others on the night of the shooting. Because genuine issues of material fact exist regarding both these matters, the Court cannot conclude at this juncture that Kaplan's actions were objectively reasonable.

A.    *Threat to Officer Kaplan*

Kaplan contends that he was justified in using deadly force against Quade because Quade struck Kaplan with his car, which made it reasonable for him to protect himself through the use of deadly force. According to Kaplan, Kaplan arrived on the scene in response to a request for assistance and observed Quade's vehicle in motion as well as Commander Guenther's attempt to box in Quade's vehicle. Kaplan saw Quade proceed around Commander Guenther's car, despite Officer Hall's commands to stop the vehicle. When Kaplan yelled at Quade to stop, Quade lay down over the center console of his vehicle, accelerated forward toward Kaplan, and struck Kaplan with his car. As Quade accelerated past Kaplan, Kaplan fired his weapon six times in a single second. Thus, Kaplan's decision to shoot was reasonable because Quade posed a threat of serious danger to him. Under Quade's version of the facts, however, a reasonable trier of fact could find that Kaplan's fear was unreasonable: Quade was driving slowly; Quade was not being investigated or under arrested for a serious crime (in fact, Quade initiated the contact with the police); Quade was already past Kaplan when Kaplan fired at him; Quade stayed as close as possible to the north side of the lot; Quade did not drive towards Kaplan; Quade never struck Kaplan with his vehicle; Quade did not lay down over the center console until after Kaplan began firing at Quade; in excess of six shots were fired at Quade's car; and the shooting lasted up to three seconds. Quade further emphasizes that: (1) Kaplan did not know why Officer Hall called for assistance at any point prior to the shooting; (2) Kaplan heard that Officer Hall's note that there was "no hurry" for assistance; (3) Kaplan did not begin shooting until after the front of the car passed Kaplan; and (4) Kaplan continued to shoot after Quade's vehicle passed.

As evidenced by the parties' conflicting accounts of the shooting, there exist several genuine issues of material fact concerning the matters leading up to the shooting as well as whether Kaplan's actions were objectively reasonable in light of the facts and circumstances confronting him. Indeed, the reasonableness of the use of deadly force in the present case will likely turn on which version of the facts the trier of fact accepts. When an individual threatens a police officer with a deadly weapon, such as a car, the police officer may use deadly force in self defense if the use of such force is consistent with *Tennessee v. Garner*. *Scott,* 346 F.3d at 757. Thus, a jury may conclude that Kaplan's version of the events is correct - that is, that Quade accelerated towards and struck Kaplan with his car – and that Kaplan's use of deadly force was ultimately justified. *See, e.g., Reid v. Ford*, No. 1:02CV00244, 2005 U.S. Dist. LEXIS 11183 (M.D. N.C. March 11, 2005) (use of deadly force reasonable when plaintiff drives recklessly, is suspected of armed robbery, and attempts to hit officers with his car). The trier of fact may, however, resolve the factual disputes in favor of Quade and conclude that such force was not objectively reasonable. *See, e.g., Murray-Ruhl v. Passinault*, 246 Fed. Appx. 338, 343-46 (6th Cir. 2007) (reasonable jury could conclude that officer's use of force was objectively unreasonable where record presented factual disputes regarding whether plaintiff aimed car at police officer, when police officer fired, and other events leading up to officer's use of deadly force); *Morris v. Vill. of Robbins*, No. 01 C 6799, 2004 U.S. Dist. LEXIS 11288, at *9-10 (N.D. Ill. June 18, 2004) (summary judgment denied where record presented factual disputes regarding whether plaintiff accelerated towards officer and who was in the car's path).

B.      *Threat to Officer Hall or others*

Kaplan also contends that he reasonably believed Officer Hall was in imminent danger of serious bodily injury. In support of this argument, Kaplan relies on *Scott v. Edinburg*, 346 F.3d 752 (7th Cir. 2003). In *Scott*, plaintiffs claimed that the defendant officer impermissibly used deadly force when he shot and killed Phillip Scott ("Scott"). 346 F.3d at 754. The shooting followed Scott's attempt to steal the police officer's car, which was located in a gas station parking lot. *Id.* As the police officer yelled at Scott to stop, Scott reversed backwards towards the officer, which forced the officer to run backwards to avoid being hit by the car. *Id.* The officer began shooting at the car no earlier than when the car stopped moving backwards and started moving forward through the parking lot at a high rate of speed. *Id.* At least twelve to fourteen bystanders were located in the gas station parking lot throughout the incident. *Id.* The defendant officer contended that his use of force was justified because he believed that Scott presented a threat to himself and to the bystanders. *Id.* at 757. In light of the facts presented, the *Scott* court arrived at two main conclusions. First, a material factual dispute regarding when the fatal shot was fired precluded summary judgment based on a self-defense theory. *Id.* "If the fatal shot was fired while Mr. Scott was driving away, then the argument that [the officer] was compelled to fire in order to protect himself would be significantly weakened." *Id.* at 757-58. If a jury found that the car was moving away, this would weaken the defendant-officer's self defense theory. *Id.* Second, the defendant-officer's use of deadly force did not violate the Fourth Amendment because the officer reasonably believed that the fleeing suspect created a danger to bystanders in the immediate vicinity. *Id.* at 760-61. In reaching this decision, the court noted the following relevant considerations: (1) the officer knew Scott had committed a forcible felony by stealing the officer's car; (2) Scott had already placed the officer in danger by attempting to run him over with the car, a deadly weapon; and (3)

at least twelve to fourteen patrons remained in the immediate vicinity as Scott rapidly accelerated forward, demonstrating little concern for their safety. *Id.* at 758-59.

Kaplan contends that, similar to *Scott*, he reasonably believed that Offical Hall was in imminent danger. Specifically, Kaplan submits that Quade disregarded the officer's commands to stop, directed his car at Kaplan, committed a forcible felony when he struck Kaplan with his car, and accelerated in the direction where he reasonably believed Hall was located. (Def. Kaplan Mem. 10; Def. Kaplan Reply 9.) Thus, Kaplan had probable cause to believe that Quade posed a significant threat to Officer Hall. The problem with such an argument is that it relies primarily on Kaplan's version of the facts. Certainly, any attempt by Quade to strike Kaplan with a vehicle would be relevant in considering the reasonableness of Kaplan's belief that Officer Hall was in danger. *See Scott*, 346 F.3d at 758. Similarly, the parties' locations, the timing of the shots, the number of bullets fired, and Kaplan's knowledge of and belief regarding Hall's location are all relevant to the objective reasonableness determination. As noted above, a majority of these facts are in dispute. Again, a determination of whether Kaplan had probable cause to believe that Quade posed a threat of serious physical harm to Officer Hall or other turns upon the story accepted by the trier of fact. *See, e.g., Murray-Ruhl*, 246 Fed. Appx. at 345-46 (trier of fact could find use of deadly force unreasonable where plaintiff's version of the facts indicated that suspect did not aim his vehicle at the officer, the officer fired a majority of bullets after the suspect's car passed, and the officer's partner was not in danger of being struck). Accordingly, the Court concludes that genuine issues of material facts preclude a grant of summary judgment based upon a defense of others theory.

In light of the numerous genuine disputes of material fact regarding the circumstances leading up to the use of deadly force in question, the Court denies Kaplan's motion for summary

judgment with respect to Count I. *See Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (*quoting Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)) ("[S]ince the *Graham* reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, . . . summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'").

III.    Qualified Immunity (Count I)

Alternatively, Kaplan contends that he is entitled to qualified immunity with respect to Quade's excessive force claim.  Under the doctrine of qualified immunity, "[g]overnmental actors performing discretionary functions are entitled to qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007) (*quoting  Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The qualified immunity analysis involves a two-part inquiry.  First, does the plaintiff present evidence that, taken in the light most favorable to the plaintiff, would allow a reasonable fact finder to determine that he has been deprived of a constitutional right  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Sallenger*, 473 F.3d at 739. Second, if so, was the constitutional right at issue clearly established at the time of the alleged violation.  *Saucier*, 533 U.S. at 201.  The plaintiff bears the burden of proving that a defendant violated a clearly established constitutional or statutory protection. *See Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994).  In the present case, the Court has already determined that, taking the facts in the light most favorable to Quade, a reasonable trier of fact could conclude that Kaplan's use of deadly force violated Quade's Fourth Amendment

rights. Thus, the primary issue is whether the constitutional right allegedly violated was defined at the appropriate level of specificity at the time of the violation.

To meet this latter inquiry, the constitutional right must be clearly established in a "particularized" sense. *Brosseau*, 543 U.S. at 198-99. Put differently, the constitutional right in question must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Miller v. Jones*, 444 F.3d 929, 934 (7th Cir. 2006) (*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). When determining whether a right is clearly established, the court is not limited to considering only precedent from the Supreme Court or this circuit. *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). In the absence of controlling precedent, a court may look to all relevant caselaw to determine "whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000).

Although the "clearly established" prong generally requires that the constitutional right in question be defined specifically, "in an obvious case" involving the use of deadly force, the general standards established by *Tennessee v. Garner* and *Graham v. Connor* are sufficient to put the officer on notice, "even without a body of relevant caselaw." *See Brosseau*, 543 U.S. at 199. Kaplan contends that this is not "an obvious case" and that *Brousseau v. Haugen*, 543 U.S. 194 (2004), requires this Court to conclude that Kaplan did not violate a clearly established constitutional right.

In *Brosseau*, plaintiff Kenneth Haugen claimed that the defendant Officer Brosseau violated Haugen's Fourth Amendment rights when the officer used deadly force to prevent Haugen from fleeing. 543 U.S. at 196-97. Brosseau initially arrived at Haugen's mother's house in response to a report of a fight. *Id.* at 195-96. At the time, Brosseau knew that there was a felony no-bail warrant out for Haugen's arrest. *Id.* at 195. Upon Brosseau's arrival, Haugen ran from the yard and hid in the neighborhood. *Id.* at 196. During a subsequent search for Haugen, which lasted thirty to forty-five minutes, officers instructed others at the scene - specifically, two men, Haugen's girlfriend, and his girlfriend's three-year-old child - to remain in their two respective vehicles. *Id.* The girlfriend's vehicle was parked on Haugen's mother's driveway, in front of and facing a Jeep (also parked in the driveway). *Id.* The second vehicle, a truck, was parked on the street in front of the driveway. *Id.* Eventually, Haugen ran back to his mother's house, jumped in the Jeep, and locked the door. *Id.* Brosseau, who believed Haugen ran to the Jeep to retrieve a weapon, pointed her gun at Haugen and ordered him out of the Jeep. *Id.* When Haugen ignored her commands, Brosseau hit the driver's side window with her gun until the glass shattered, struck Haugen in the head with the barrel and butt of her gun, and unsuccessfully attempted to grab his keys. *Id.* Haugen, undeterred, started the jeep and began to move towards the end of the driveway. *Id.* As the car started to move or shortly after it began to move, Brosseau fired one shot through the rear driver's side window, which struck Haugen in the back. *Id.* at 196-97.

The Supreme Court described the situation confronting Brosseau as follows: "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Id.* at 200. When considering whether Brosseau violated a clearly established right, the Supreme Court examined various cases involving police

shootings in the context of vehicular flight and concluded that the cases "by no means 'clearly establish' that [the officer's] conduct violated the Fourth Amendment." *Id.* at 201. Instead, the cases suggested that Brosseau's conduct "fell in the 'hazy border between excessive and acceptable force.'" *Id. (quoting Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

If the facts in dispute are resolved in Quade's favor, the current action involves several distinguishing factors that lift Quade's claim from "the hazy border between excessive and acceptable force" to the realm of clearly established law. Most importantly, unlike *Brosseau*, the current suit involves numerous disputed issues of fact. Kaplan asserts that, like *Brosseau*, Kaplan observed a suspect who used a vehicle to avoid capture, demonstrated a disregard for the safety of others, and posed a risk to others in the immediate vicinity. (Def. Kaplan. Mem. 16-17.) Fatal to Kaplan's argument, however, is the fact that "his brief [and argument] . . . [are] replete with his own versions of the events." *Cowan v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003) (internal quotations omitted). Kaplan may well be entitled to qualified immunity if the jury were to believe Kaplan's version of the events - specifically, that Kaplan fired at Quade after Quade, in response to Kaplan's stop orders, accelerated towards Kaplan, struck Kaplan with the car, and that Kaplan continued to fire while Quade drove towards the area where Kaplan reasonably believed Hall was located. Quade's account of the shooting, however, presents the following situation: Kaplan knew Hall requested assistance but noted that there was "no hurry"; Kaplan did not know why Hall stopped Quade; Quade was not under arrest (there was no pending warrant); Quade ignored Officer Hall's stop command and instead moved slowly around Commander Guenther's car; upon rounding the corner, Quade moved towards the exit, staying as close to northern boundary of the lot as possible and not in Kaplan's direction; Kaplan pushed himself off Quade's car and shot at Quade through the

driver's side window after the front of the car began to pass him; Kaplan continued to shoot at

Quade as the car passed and fired at least once after the car passed; and Kaplan did not know where

Hall was located and did not reasonably believe that he was in immediate vicinity. Under the latter

set of circumstances, an extensive particularized review of case law would be unnecessary; Kaplan's

decision to use deadly force would have violated Quade's clearly established constitutional rights

as established *Garner*, *Graham*, and *Scott*.[5]  *See, e.g., Murray-Ruhl*, 246 Fed. Appx. at 347 (no

qualified immunity at summary judgment where a reasonable jury could find that, under plaintiff's

version of the fact, defendant violated plaintiff's "clearly established rights" as defined by *Garner*);

*Sigley v. City of Parma Heights*, 437 F.3d 527, 536-37 (6th Cir. 2006) (same); *Broussard v.

Lousiana State Police*, No. 05-0574, 2006 U.S. Dist. LEXIS 84573, at *16-19 (W.D. La. Nov. 20,

2006) (same); *see also Cowan*, 352 F.3d at 761-65; *Abraham v. Raso*, 183 F.3d 279, 292-96 (3d Cir.

1999); *McCaslin v. Wilkins*, 183 F.3d 775, 778-79 (8th Cir. 1999). Accordingly, summary judgment

is denied as to Count I.

III.    <u>Municipal Liability (Count III)</u>

The doctrine of *respondeat superior* cannot be utilized to hold local governmental units

liable for § 1983 violations. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). A

municipality may only be held liable under § 1983 when its "policy or custom" results in a

---

[5] A plaintiff can defeat qualified immunity by offering a closely analogous case in which the court denied the defense. *Burns v. Reed*, 44 F.3d 524, 526 (7th Cir. 1995). In support of his opposition to qualified immunity, Quade also contends that *Estate of Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1995), represents a closely analogous case in which the Seventh Circuit denied qualified immunity at summary judgment. According to Quade, the current case presents a dispute of fact regarding the relative location of the parties that precludes summary judgment and that the reasoning of *Starks* supports the proposition that a dispute regarding the relative location of the parties precludes summary judgment. Quade reads *Starks* much too broadly. In *Starks*, the central dispute involved whether the police officer prompted the danger he faced by placing himself in front of a moving vehicle (so he could prevent it from escaping) before or after the car began moving forward. 5 F.3d at 7-13. There is no indication that Kaplan placed himself in front of Quade's vehicle and unreasonably prompted the danger he claims he faced.

constitutional injury to the plaintiff.  *See id.* at 694.  Quade submits that the Village is liable under two theories of municipal liability: (1) failure to train and (2) failure to discipline.  Because Quade has not created a triable issue under either theory, the Court grants the Village's Motion for Summary Judgment with respect to Count III.[6]

A.      *Failure to train*

"Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."  *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  To ensure "that isolated instances of misconduct are not attributable to a generally adequate policy or training program, [the Seventh Circuit] require[s] a high degree of culpability on the part of the policymaker."  *Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993).  In addition, the plaintiff must demonstrate that the failure to train caused the constitutional deprivation at issue.  *Palmquist v. Selvik*, 111 F.3d 1332, 1344 (7th Cir. 1997) (*citing Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993)).  Culpability, combined with the causation requirement, teaches that "liability [must] be based on a finding that the policymakers have actual or constructive notice that a particular omission is likely to result in constitutional violations."  *Id.*  Given this strict framework, "an allegation of 'failure to train' is available only in limited circumstances."  *Id.*

---

[6] The Court notes that both Quade and the Village rely on facts that they fail to include in their statement of facts.  District courts are entitled to enforce Local Rule 56.1 strictly.  *See Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000)).  Thus, to the extent that Quade or the Village include facts in their briefs but not in their respective statements of fact, such facts will not be considered by the Court because doing so "would rob the other party of the opportunity to show that such facts are disputed."  *See Divane v. Sonak Elec. Contractors, Inc.*, No. 05 C 1211, 2008 U.S. Dist. LEXIS 1901, at *2 (N.D. Ill. Jan. 9, 2008); *see also Malec v. Sanford*, 191 F.R.D. 581, 548 (N.D. Ill. 2000).

Proof of deliberate indifference requires more than a showing of simple or even heightened negligence. *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997). A failure to provide proper training may be said to represent a city policy or custom when, "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy is so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. Such deliberate indifference may arise in one of two circumstances. First, "a municipality acts with deliberate indifference when, 'in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights,' that the deficiency exhibits deliberate indifference on the part of municipal policymakers." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (*quoting City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). For instance, because the need to train officers in the constitutional limitations of the use of deadly force may be said to be "so obvious," the failure to do so could be characterized as deliberate indifference. *City of Canton*, 489 U.S. at 390 n.10. Second, one may find deliberate indifference "when a repeated pattern of constitutional violations makes 'the need for further training . . . plainly obvious to the city policymakers.'" *Jenkins*, 487 F.3d at 492 (*quoting City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)).

Quade makes no mention and presents no evidence of a pattern of prior constitutional violations that may have resulted from inadequate training. Instead, Quade opts for the former theory of deliberate indifference and contends that the Village failed to train Kaplan with respect to the appropriate use of deadly force. (Pl. Resp. Mem. 11-12.) This failure to train theory is based

upon the following two pieces of evidence: (1) Waller's testimony regarding Kaplan's field training program; and (2) a statement made by Sergeant Parrish at his deposition regarding his knowledge of the use of deadly force standard. (*Id.*) Because a reasonable jury could not conclude, based on this evidence submitted, that the Village had "actual or constructive notice that a particular omission [wa]s likely to result in constitutional violations," *Palmquist*, 111 F.3d at 1344, Quade's failure to train claim must fail.

Despite Quade's argument to the contrary, Quade's reliance on Waller's testimony does not support a failure to train claim. Quade contends that the Village "failed to provide Kaplan with the appropriate training covering the use of deadly force." (Pl. Resp. Def. Village 11.) However, Quade misstates the scope of the observations articulated by Waller in the cited portion of Waller's deposition transcript. Specifically, Waller testified that the Village failed to provide Kaplan with training covering the appropriate use of deadly force during Kaplan's field training program and that the Village had a responsibility to ensure that new officers understood department policy, especially in critical areas such as deadly force.[7] (*Id.*; Pl. 56.1 Resp. Village, Ex. 3, Waller Dep. at 268-69.) Waller based these observations on the documentation he received related to Kaplan's initial FTO training when he joined the Department. (Pl. 56.1 Resp. Village, Ex. 3, Waller Dep. at 269.) When analyzing the level of training in a recurring situation allegation, however, "the focus must be on the program, not on whether particular officers were adequately trained." *Palmquist*, 111 F.3d at 1345 (*citing City of Canton v. Harris*, 489 U.S. 378, 390-91 (1989)). "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's

---

[7] Quade further submits that Kaplan did not receive training concerning when to fire at a vehicle when he perceives the vehicle as a threat. Because neither party included this fact in their respective Rule 56.1 submissions, the Court will not consider this fact.

shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390-91. Thus, Waller's testimony, which focuses on only one aspect of the training afforded to Kaplan (more specifically, his initial FTO training), does not establish a failure to train claim. Moreover, in relying entirely on Waller's observations regarding Kaplan's field training, Quade ignores the training that the officer's received from the police academy and other sources. *See Manzella v. Vill. of Bridgeview*, No. 01-C-8202, 2004 U.S. Dist. LEXIS 15450, at *18 (N.D. Ill. Aug. 4, 2004) (*citing Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997)) (In determining the adequacy of training, a court must not "ignore the training the officers did receive from other sources, including the police academy.").

In further support of his theory, Quade also contends that, when the Village offers use of deadly force training to its officers, it does so "inappropriately and without knowledge of the law." (Pl. Resp. Def. Village Mem. 12.) In support of this contention, Quade cites to the following exchange, which occurred during the deposition of Sergeant Parrish:

> Q: In order to use deadly force if you are in imminent threat or imminent danger, does that have to be a reasonable belief that you're in imminent threat or imminent danger or does that have to be under any type of belief, if you know?
> A: I don't know.[8]

(Pl. 56.1 Resp. Village, Ex. I, Parrish Dep. at 36.) According to Quade, if Parrish, who teaches two of the Village's use of force related trainings, did not know at his deposition that an officer must have a reasonable belief of imminent harm before using deadly force, then the Village must be

---

[8] The Court also notes that the question eliciting the response at issue was subject to an objection of form. (*See* Pl. Resp. Def. Kaplan 56.1, Parrish Dep. at 36.)

employing a department of officers who are inappropriately trained as to when an officer may use deadly force.  (Pl. Resp. Def. Village Mem. 12.)

The cited exchange, standing alone, does not sustain a theory that the Village either did or failed to do anything in terms of training its officers that would rise to the level of deliberate indifference, or that the Village had any notice, real or constructive, that its training was likely to result in a constitutional violation. Even when this Court ignores the convoluted nature of the question posed to Sergeant Parrish and draws all reasonable inferences in favor of Quade, a reasonable jury could not conclude, based on Parrish's response alone, that the Village failed to train its police officers in a relevant respect.  Noticeably lacking from Quade's argument is any indication that the Village, through its training program or otherwise, ever conveyed an incomplete or inaccurate standard to its officers during the several training sessions utilized by the Village.  For instance, there is no evidence that an officer believed that an unconstitutional practice was consistent with the Village's policies and practices, *see, e.g., Sornberger v. City of Knoxville*, 434 F.3d 1006, 1030 (7th Cir. 2006), or that the Village permitted and condoned violations despite its policies, *see, e.g., Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 928 (7th Cir. 2004).

Nor has Quade challenged the general use of force training program implemented by the Village, aside from noting Sergeant Parrish's response to the question stated above.  Moreover, "[f]or the § 1983 failure in training to constitute actionable 'policy,' this failure to train must reflect deliberate or conscious choice."  *Erwin v. County of Manitowoc*, 872 F.2d 1292, 1298 (7th Cir. 1989).  In the present case, there is no evidence indicating that a City policymaker had notice of a deficiency within its use of force program such that the failure to resolve that deficiency could be interpreted as deliberate indifference.  *See, e.g., Palmquist*, 111 F.3d at 1346.  Thus, while the need

27

to train officers in the constitutional limitations of the use of deadly force is "so obvious" that the failure to do so could be characterized as "deliberate indifference," the Court concludes that Quade has failed to present any evidence in support of this proposition.

In addition to his failure to present proof of culpability, Quade has also failed to demonstrate a triable issue regarding the requisite element of causation. To sustain a municipal liability claim, the plaintiff must establish that "the policy or custom was the 'moving force' behind the constitutional deprivation." *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002). In other words, Quade "must demonstrate that 'the injury [would] have been avoided had the employee been trained under a program that was not deficient in the identified respect.'" *Palmquist*, 111 F.3d at 1346 (*quoting City of Canton v. Harris*, 489 U.S. 378, 391 (1989)). In this case, Quade has failed to recognize or present any proof that the identified deficiency in training – or, more specifically, Sergeant Parrish – actually caused Kaplan's alleged indifference to Quade. *See, e.g., id.*; *see also Fowler v. South Bend Police Dept.*, No. 3:06-CV-276 CAN, 2007 U.S. Dist. LEXIS 45322, at *9-10 (N.D. Ill. June 20, 2007).

Finally, the Court notes that Quade also failed to present evidence of a series of other bad acts[9] or constitutional violations from which one could infer that a policymaker was bound to have noticed the training inadequacy. *See Woodward*, 368 F.3d at 927 ("series of bad acts" may put policymaker on notice of inadequacy); *see also City of Canton*, 489 U.S. at 390 n.10. "Without a showing of such deficiencies along with an awareness of them by the Village government, there is insufficient evidence on which to ground municipal liability." *Palmquist*, 111 F.3d at 1346.

_____

[9] For the reasons set forth in subsection (III)(B), a reasonable jury also could not conclude that, based on Quade's sparse evidence regarding Kaplan's prior discipline, that "the need for further training [with respect to the use of deadly force] must have been plainly obvious to the city policymakers, who, nevertheless, . . . [remained] deliberately indifferent to the need." *See City of Canton v. Harris*, 489 U.S. 378, 390 n.1 (1989).

As the party on whom the burden of proof rests at trial, Quade was obligated to come forward with evidence to support his failure to train claim in order to survive summary judgment. *Jenkins*, 487 F.3d at 493. Because Quade has failed to present evidence from which a reasonable jury could conclude that the Village had "actual or constructive notice that a particular omission [was] likely to result in constitutional violations," *Palmquist*, 111 F.3d at 1344, the Court grants the Village's motion for summary judgment as to Quade's failure to train claim.[10]

B.      *Failure to Discipline*

The failure to discipline theory "often supports a finding of municipal liability because a policy of condoning abuse may embolden a municipal employee and facilitate further abusive acts." *Sassak v. City of Park Ridge*, 431 F. Supp. 2d 810, 816 (N.D. Ill. 2006). "A custom of failing to discipline police officers can be shown to be deliberately indifferent if the need for further discipline is so obvious and disciplinary procedures so inadequate as to be likely to result in the violation of constitutional rights such that a jury could attribute to the policymakers a deliberate indifference to the need to discipline the police force." *Czajkowski v. City of Chicago*, 810 F. Supp. 1428, 1439 (N.D. Ill. 1992) (*citing Tapia v. City of Greenwood*, 965 F.2d 336, 338 (7th Cir. 1992)). To establish municipal liability, a plaintiff must prove not only a custom of failing to discipline, but also that the injury at issue was caused by the custom. *Id.; see also City of Canton*, 489 U.S. at 385. Because Quade has failed to present evidence from which a reasonable jury could infer deliberate indifference on the part of the Village or a causal connection between the Village's alleged failure

---

[10] In support of its motion for summary judgment, the Village also contends that its use of force training complies with state standards and, therefore, the adequacy of its training program cannot be questioned. The Court notes, however, that this argument is largely based on information that the Village failed to include in its Local Rule 56.1 submissions. Because the Court has already determined that Quade's failure to train claim does not survive summary judgment, the Court need not make a determination regarding whether the program at issue complies with the state standards absent this extrinsic evidence.

to discipline and Quade's injuries, the Village's motion for summary judgment as to Quade's failure to discipline claim is granted.

A municipality may be at fault for an officer's constitutional violation if its policymakers knew or should have known that the officer had dangerous propensities and, in the face of an obvious danger, "either encouraged, acquiesced in, or were deliberately indifferent to those propensities." *See Williams v. City of Chicago*, 658 F. Supp. 147, 154 (N.D. Ill. 1987) (*citing Brandon v. Holt*, 469 U.S. 464, 466-67 (1985)). In this case, Quade maintains that Kaplan's prior disciplinary record illustrates that the Village was on notice that "Kaplan's irresponsible behavior could eventually lead to a . . . violation of a citizen's [Constitutional] right." (Pl. Resp. Village Mem. 5.) Quade presents the following evidence to support his deliberate indifference theory: (1) Kaplan received several written warnings and reprimands throughout his employment with the Department; (2) the Department explicitly questioned Kaplan's decision-making ability in Kaplan's personnel records;(3) on one occasion, the Department suspended Kaplan after Kaplan failed to report to duty at a homecoming parade detail; and (4) Kaplan was terminated from his prior job for not following direct orders.[11] A reasonable trier of fact could not infer from these facts that the Village was on notice of a propensity for unconstitutional behavior because the facts presented are completely devoid of detail. For instance, Quade fails to submit any specifics regarding the nature of the internal written warning and reprimands received by Kaplan, when or why the Department issued the warnings and reprimands, or how many reprimands the Department issued. Similarly,

---

[11] In his Memorandum of Law In Response To Defendant's, Village of Mundelein, Motion For Summary Judgment, Quade proffers and relies on additional information regarding Kaplan's disciplinary record and the Department's evaluation of Kaplan's performance. (*See* Pl. Resp. Village Mem.) Because Quade failed to include such information in his Local Rule 56.1 (b)(3)(C) statement of facts or lay a proper foundation to overcome the hearsay hurdle, the Court will not consider this extrinsic information.

while the Department may, at an unknown time, have explicitly questioned Kaplan's decision-making ability, there is no indication as to the context in which this occurred. Finally, while it is undisputed that Kaplan was terminated from the Lake Bluff Police Department for failing to follow direct orders, Quade provides no evidence that the Village had knowledge of the termination or detail regarding the circumstances leading up to the termination.[12] The only specifics provided by Quade relate to a suspension in response to a failure to report to duty at a homecoming parade. While a failure to report is no doubt serious, this violation standing alone or in conjunction with evidence of "several written warning and reprimands," does not support a theory of deliberate indifference.[13]

Nor does Quade present evidence of other constitutional violations or a series of other bad acts to support his municipal liability claim. Generally, "where the policy relied upon is not itself unconstitutional, considerably more proof that the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality and the causal connection between the [policy] . . . and the constitutional deprivation." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (*quoting Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985)). Although the Supreme Court and the Seventh Circuit have recognized an exception to this general rule in a "narrow range of circumstances," *see id.*, where the violation of federal rights was "a highly predictable consequence" of the municipality's failure to act," *see Woodward*, 368 F.3d at 929 (internal quotations omitted),

---

[12] In an attempt to bolster his failure to discipline theory, Quade also contends that the Village had a duty to conduct a more thorough screening process before hiring Kaplan. As noted above, however, Quade fails to present any evidence regarding the Village's hiring/screening process with respect to Kaplan, the details surrounding Kaplan's prior termination, or that the Village knew of the prior termination. Accordingly, this theory does not create a triable issue.

[13] The Court also notes that Quade's evidence regarding the Department's use of reprimands, a suspension, performance plans, and counseling sessions actually belies the existence of a failure to discipline practice. Nevertheless, because the Court grants the Village's motion for summary judgment as to Count III on other grounds, it need not delve into this issue.

Quade has presented no evidence from which a reasonable jury could infer that the current action falls in that narrow exception. *See Calhoun*, 408 F.3d at 381 ("[A]lthough the [Supreme Court] . . . has left room for this 'narrow range of circumstances,' it is telling that no court has directly addressed such a case.").

Also fatal to Quade's claim is his failure to present any evidence establishing a causal link between the Village's alleged failure to discipline and Quade's injury. As discussed in detail above, a municipality may be held liable for the acts of its officers where its policy is the "moving force" behind the constitutional deprivation. *See City of Canton*, 489 U.S. at 389. Absent such evidence, Quade's failure to discipline claim cannot survive. *See, e.g., Lewis v. City of Chicago*, No. 04 C 3904, 2005 U.S. Dist. LEXIS 7482, at *23-24 (N.D. Ill. April 26, 2005) (plaintiff must establish causal link between failure to discipline and the constitutional injury).

Finally, the Court must address Quade's misplaced reliance on *Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006). In *Sornberger,* the plaintiffs Scott and Teresa Sornberger claimed that City of Galesburg police officers arrested them without probable cause and subsequently coerced plaintiff Teresa Sornberger ("Teresa") to confess. 434 F.3d at 1013, 1023. With respect to Teresa's false arrest claim, the parties dispute whether Teresa voluntarily left with the defendant officers or whether one of the defendant officers told Sornberger that "she 'needed' to accompany [the officer]'" to the police station. *Id.* at 117. With respect to the confession, Teresa claimed that she was psychologically coerced into confession by an officer who, among other things, "threatened to call the Department of Children and Family Services ('DCFS') to take away her children if she continued to maintain her innocence" and repeatedly told Teresa to think about her children. *Id.* at 1011. Teresa alleged that the City of Galesburg "had a policy of coercing

confessions out of female suspects by threatening to have DCFS take away their children." *Id.* at 1030. In support of this theory, Sornberger offered the testimony of criminologist Paul Palumbo, "who 'reviewed the [Galesburg Police Department's] practices and policies and created an expert report.'" *Id.* Palumbo concluded that, "based on his review of complaints lodged against Galesburg, that the Galesburg Police Department 'has been deliberately indifferent to a pattern of use of coercive threats, including threats to misuse DCFS, by its officers.'" *Id.* In addition, Sornberger relied upon the testimony of a Galesburg officer who admitted that, in his understanding, telling a person in Teresa's situation that the person had to come with the officer to the police station was consistent with the department's policies and practices. *Id.* at 1030. Based on this evidence, the Seventh Circuit concluded the plaintiffs had created triable issues with respect to municipal liability pursuant to a failure to train theory and a failure to discipline theory. *Id.*

Drawing on *Sornberger*, Quade contends that Kaplan's personnel records in conjunction with certain cited portions of his expert's deposition creates a triable issue with respect to municipal liability. However, *Sornberger* is distinguishable from the instant case. Unlike Sornberger's expert, who affirmatively concluded that the Galesburg Police Department was "'deliberately indifferent to a pattern of use of coercive threats, including threats to misuse the DCFS,'" *id.*, Waller concluded that: (1) Kaplan would have been terminated prior to the incident at issue, had the Department remained consistent with its procedures, and (2) that the Department, "time after time," was of the opinion that Kaplan had exhibited poor judgment while on duty. (Pl. Resp. Def. Village 56.1, Ex. C, Waller Dep. 294.) More importantly, in contrast to Waller, Sornberger's expert based his conclusion upon his review of actual complaints lodged against Galesburg and, from this review, concluded that the Galesburg Police Department was "'deliberately indifferent to a pattern of use

of coercive threats.'" *Id.* From this, one could reasonably infer not only the existence of complaints filed against the city, but also that these complaints related to officers' use of coercive threats to obtain confessions - the exact constitutional injury at issue in the case. Thus, a reasonable trier of fact could conclude, based on the evidence presented, that Galesburg was on notice of a pattern of constitutional violations and, by failing to act, remained deliberately indifferent. In the present case, however, Quade has presented this Court with no admissible evidence that the Village received complaints indicating that the need for further discipline was so obvious and disciplinary procedures so inadequate as to likely result in the constitutional violation. Thus, Waller's observations, without more, are insufficient to defeat summary judgment.

In light of the foregoing, this Court does not believe that a reasonable jury could find that the Village had a practice of failing to discipline police officers so as to subject it to liability under § 1983. Because Quade failed, under any theory, to raise a genuine issue of material fact concerning municipal liability, the Court grants the Village's motion for summary judgment with respect to Count III.

IV.    Battery against Officer Kaplan (Count II)

Kaplan argues that the Court should grant summary judgment with respect to Quade's battery claim because Kaplan is entitled to immunity under sections 2-201 and 2-202 of the Illinois Tort Immunity Act ("Tort Immunity Act" or the "Act") and pursuant to 720 ILCS 5/7-5 of the Illinois Criminal Code. Under the Tort Immunity Act, "Illinois adopted the general principle that local governmental units are liable in tort, but limited this liability with an extensive list of immunities based on specific government functions." *Vill. of Bloomingdale v. CDG Enters., Inc.*, 752 N.E.2d 1090, 1095 (Ill. 2001) (citations omitted). Defendant bears the burden of establishing that he is

immune from liability pursuant to the Act. *People ex rel. Birkett v. City of Chicago*, 758 N.E.2d 25, 28 (Ill. App. Ct. 2001).

Under section 2-201, "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201. Kaplan asserts that he is entitled to immunity pursuant to section 2-201 "because he was engaged in acts of discretion at the time of the shooting." (Def. Kaplan Mem. 19.) To qualify for immunity under this section, however, the conduct at issue must be both an exercise of discretion *and* a policy determination. *Harineck v. 161 North Clark Street Ltd.*, 181 Ill. 2d 335, 341, 692 N.E.2d 1177, 1182, 230 Ill. Dec. 11 (1998). An act is a "determination of policy" if the act requires a balancing of competing interests and a judgment as to which solution would best serve each of those interests. *Id.* at 342. In the present case, Kaplan has neither argued nor presented sufficient undisputed evidence for the Court to conclude, as a matter of law, that the conduct at issue involved a policy determination. Thus, the Court will not grant summary judgment pursuant to section 2-201. *See, e.g., Valentino v. Hilquist*, 785 N.E.2d 891, 901 (Ill. App. Ct. 2003) *see also Wilhold v. Gebke*, No.04-cv-0586-MJR, 2005 U.S. Dist. LEXIS 20096, at *8 (S.D. Ill. Sept. 1, 2005) (battery is not an exercise of discretion or determination of policy).

Section 2-202 of the Act provides: "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. The statute defines "willful and wanton conduct" as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their

property." 745 ILCS 10/1-210. Illinois law further provides that a police officer, when effectuating an arrest, is justified in using any force that "he reasonably believes to be necessary to effect the arrest and . . . any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making the arrest." 720 ILCS 5/7-5. In addition, a police officer is authorized to use force likely to cause death or great bodily harm "when he reasonably believes that such force is necessary to prevent death or great bodily harm to himself or such other person," or when the officer reasonably believes both that the "force is necessary to prevent the arrest from being defeated by resistance or escape" and "[t]he person to be arrested has committed or attempted a forcible felony which involves the infliction or threatened infliction of great bodily harm or is attempting to escape by use of a deadly weapon, or . . . indicates that he will endanger human life or inflict great bodily harm unless arrested." *Id.*

In the present case, Kaplan contends that he is entitled to immunity under section 2-202 and 720 ILCS 5/7-5 because his actions were not wilful or wanton and the use of force was authorized. In support of this argument, Kaplan asserts that Quade attempted to escape through the use of a deadly weapon - his car - and that Kaplan perceived a threat of imminent danger to Officer Hall and others after Quade directed his car at and struck Kaplan. (Def. Kaplan Mem. 18.) Whether conduct is sufficiently willful and wanton is ordinarily a question of fact for the jury and rarely should be ruled upon as a matter of law. *See Mostafa v. City of Hickory Hills*, 677 N.E.2d 1312, 1319 (Ill. App. Ct. 1997). In Count I, this Court previously found several disputes of material fact concerning the circumstances leading up to Kaplan's use of deadly force and the reasonableness of Kaplan's conduct. Thus, for the reasons that justified denying qualified immunity under Count I, a reasonable juror could conclude that Kaplan's use of force was unreasonable under 720 ILCS 5/7-5 and

conclude Defendants acted willfully and wantonly with respect to Quade's rights. *See, e.g., McGovern v. Vill. of Oak Lawn,* No. 01 C 3772, 2003 U.S. Dist. LEXIS 799, *22-23 (N.D. Ill. Jan. 21, 2003) (summary judgment as to battery claim denied where the parties dispute the reasonableness of the officer's conduct); *Brandon v. Maywood,* 157 F. Supp. 2d 917, 934-35 (N.D. Ill. 2001). Accordingly, Kaplan's motion for summary judgment as to Count II is denied.

V.     Battery against the Village (Count IV)

The Village argues that the Court should dismiss with prejudice Quade's battery claim against the Village. (Def. Village Mem. 9.) Specifically, the Village contends that, because the Village would have to indemnify Kaplan for any compensatory damages if a trier of fact found in favor of Quade with respect to Quade's battery claim, Count IV is redundant. The Court denies the Village's request for dismissal.

While the Village included this argument in its Motion for Summary Judgment, the Village is, in essence, moving to dismiss Quade's claim pursuant to Federal Rule of Civil Procedure 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), a court must accept as true all facts alleged in the complaint and construe all reasonable inferences in favor of the plaintiff. *See Murphy v. Walker,* 51 F.3d 714, 717 (7th Cir. 1995). To state a claim upon which relief can be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In order to survive a motion to dismiss for failure to state a claim, the claim must be supported by facts that, if taken as true, at least plausibly suggest that the plaintiff is entitled to relief. *See Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955, 1974 (2007).

In Count IV, Quade alleges that Kaplan was an agent and employee of the Village and, at all relevant times, acted within the scope of that agency and employment. (Compl. ¶ 41.) Quade further alleges, among other things, that Quade suffered serious injuries, including two gunshot wounds in the back, as a result of the acts or omissions of the Village by and through its agents. (Compl. ¶ 43.) Despite Quade's failure to address or even acknowledge the Village's arguments with respect to Count IV, the Court interprets Count IV as a claim for *respondeat superior* liability against the Village for the acts of Kaplan. Under this theory, "a municipality may be held liable for the tortious conduct of a police officer when the act occurs in the scope of the officer's employment." *See Lombardi v. Range*, No. 01 C 6444, 2003 U.S. Dist. LEXIS 12812, at *15 (N.D. Ill. July 25, 2005) (summary judgment denied where question of fact remained as to whether police officer committed battery and/or assault during the scope of employment); *Franklin v. Vill. of Riverdale*, No. 94 C 3983, 1995 U.S. Dist. LEXIS 15566, at *13-14 (N.D. Ill. Oct. 19, 1995). A state law battery claim based on a *respondeat superior* theory is not identical to a state law battery claim against the officer individually. *See Philpot v. Burke*, No. 94 C 6794, 1995 U.S. Dist. LEXIS 121, at *5 (N.D. Ill. Jan. 10, 1995).

Because the Court interprets Count IV as a claim under the *respondeat superior* theory of liability, the Court denies the Village's request for dismissal of Count IV.[14]

---

[14] Because the Village challenges the redundancy of Count IV rather than Quade's ability to prove his *respondeat superior* claim, the Court will not consider whether the Village is entitled to summary judgment as a matter of law with respect to Count IV. *See Culver v. Gorman & Co.*, 416 F.3d 540, 550 (7th Cir. 2005) (*quoting United States v. Turcotte*, 405 F.3d 515, 536 (7th Cir. 2005) ("'unsupported and undeveloped arguments are waived'"); *see also Graham v. AT&T Mobility, LLC*, Nos. 06-3020, 06-3734, 2007 U.S. App. LEXIS 21598, at *12 (7th Cir. Sept. 6, 2007) ("[T]his court is not obligated to research and construct legal arguments open to parties, especially when they are represented by counsel.'") (*quoting John v. Barron*, 897 F.2d 1387, 1393 (7th Cir. 1990)).

## CONCLUSION AND ORDER

For the reasons stated herein, Defendant Kaplan's Motion for Summary Judgment is denied. In addition, the Court grants in part and denies in part both Defendant Seamus Kaplan's Motion to Strike Plaintiff's Response to Defendant Seamus Kaplan's Reply in Support of his Motion for Summary Judgment and Defendant Kaplan's Motion to Strike Portions of Plaintiff's Local Rule 56.1(b)(3)(B) Response to Kaplan's Statement of Facts and Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts. Finally, the Village of Mundelein's Motion for Summary Judgment is granted in part and denied in part.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: March 31, 2008